Good morning, Your Honors. Please, the Court. Race discrimination cases are extremely difficult to prove in the absence of direct, explicit racist comments. But this case typifies, while we have the analytical framework, while we have the burden-shifting analysis, the prima facie case, an opportunity to show that there's pretext in the absence of those explicit racist remarks because, generally speaking, people don't understand discrimination in the absence of those things. I think everybody who stood up this morning has had a cold, but go ahead. I'm sorry. The specific issues that we wanted to discuss was whether plaintiff established a prima facie case, which we believe was easily established, whether plaintiff established pretext for the legitimate non-discriminatory reasons articulated by defendant's appellee, and whether there were actual tribal issues of fact for which the jury should consider. Above all, plaintiff appellant does not have to prove at summary judgment stage that, yes, indeed, race was the reason why I did not get the promotion, the reason why I was suspended. At that point in stage, we're not putting on the case. We're showing in response to defendant's contention that there aren't any tribal issues of fact. And assuming everything is … Technically speaking, what you have to prove is that a reasonable juror on the record, assuming your facts are correct, could find that you met your burden of proof. Could find something different. Exactly. And I think that there were numerous disputed facts which the jury would have to resolve. What the lower court did, and in particular with regard to the additional facts that plaintiff raised, the lower court summarily concluded that all of those facts were immaterial and not relevant. Those facts went directly to issues of Mr. Price being blamed for other managers' failures. Isn't that what a manager does, is be blamed for other managers or other people in his store? His job is to manage. And if other people are not doing well, then he's responsible. I mean, that's why CEOs get fired no matter if they're doing a very good job, if they can't make other people operate. Ultimately, the manager is responsible for the subordinates. I think the record shows that Mr. Price complained about these managers not performing, asked for assistance, and he did not get it. And with regard to his specific performance, when he was talking about the audits that Ms. Ezezie did with his store in terms of how these violations occurred, who was the swing manager at the time? Who was the assistant manager at the time? Sometimes Mr. Price wouldn't be on the premises when these things were brought up. But yet, he's going to be ultimately responsible, certainly. But should he be penalized for it, should the company use that with regard to say, you're not a performer? You don't deserve to be promoted. Where in the record does it demonstrate, because I read the record pretty carefully, that he asked for assistance with regard to specific people or specific problems and didn't get it? If you look in his declaration. If you look at Mr. Price's declaration. One moment. I'm sorry. Maybe you want to do it when you come back so we don't take up too much time. Okay. He specifically had a discussion with Mr. Cantor that these people are not performing. I need some assistance. And yet, he never got it. And I think that kind of shows the underlying subtle type of discriminatory animus that was brought against him. If you take a snapshot of Mr. Price's situation. Here he has been a manager in management, not just at the store, but in management. Came in as a manager for seven years without any problems, no discipline, an excellent track record. Mrs. Zizzi comes in as the new area supervisor. And within six months, now he has write-ups, now he has performance problems, he has attendance problems, and he gets suspended for the first time in eight years. One thing that's confusing is what time frame we're talking about. It appeared in the briefs and elsewhere that at points you were talking about the promotions that occurred in December, the ones in which Mrs. Zuzo herself was promoted. But that doesn't seem to be covered by the EEOC complaint or by what you're now saying, because her complaint was really about her. So until she was the manager, he doesn't seem to be. Am I correct in believing that the issue is not the December promotions? It's after that. No. You're correct, Your Honor. The December promotion was the basis for the first EEOC charge that was filed early June. He – we talked about that he got passed over in December. We're talking about a six-month period in terms of – But I thought the – that complaint complained about that from the time she became the manager was the complaint. So since she was only the manager starting in December, that – it couldn't deal with the promotion which resulted in her being the manager. In part. In part, that was the case from the sense of the company. And in part, this specific supervisor giving him negative evaluation so that he could not be promoted for other opportunities. And I think there was a dispute as to whether some other positions were available in terms of what Mr. Cantor said and what Mr. Price said regarding his ability to be promoted. I think I understand. I understand. What I'm reading is it says that the complaint is he was subjected to different treatment by her. That's what it says. Correct. How does that indicate that he's complaining about her promotion? From – It says she couldn't – she couldn't have been subjected him to bad treatment before her promotion. Correct. And I understand that. From December through June when he was suspended. Right. So that's what we're talking about. Not the promotions that occurred in December, but after that. That's correct. Just to clarify. And that he could have been promoted within that time period. But because – So we're not talking about the December promotion. Okay. I understand. I understand. But because of Ms. Assisi's treatment, she basically – we can basically put him in a position where he would not be able to be promoted because of all the negativity. And if you recall, Mr. Price continued to solicit to Mr. Cantor, I would like to be promoted. I would like to be promoted. What do I need to do to be promoted? He goes to the store in Carson, a challenge store, and this was another fact we thought was important. Mr. Cantor indicated that the Carson store was a challenge store, meaning that they needed someone with a special type of leadership to get the sales turned around. Now, if Mr. Price wasn't a type of a performer, if he was someone who was not – if he was someone who was just average, you would not put just an average person to a store that had all these problems. You want to put somebody in who you know is a leader, who you know can turn it around. And that's why he was at that store. But he might need some time to do it. So the fact that he thought he was going to get promoted in February after he just got there in December, and that it was discriminatory not to do that when he had no time to perform, that seems like a strange way to allege that it was race discrimination. That is – could be accepted. But you also have to look at the trend. In the record, you talk about the trends. His overall performance in terms of he was always improving, he was always getting positive evaluations. And the company talks about how you look at that in the aggregate in terms of whether someone should be promoted or not. So we're not only talking about the brief time which – at the Carson store, we're also talking about his past performance years, which, as the record shows, Mrs. Easy did not even bother to look at those to give him a nod whether he should be promoted. That circumstance shows that there was some type of animus. Does the record show any openings during that period for a promotion? The record shows that it was the practice to solicit and talk about openings with your area supervisor and with Mr. Cantar, and that they had the ability to move people around. In terms of any specific – I don't – I haven't seen anything where McDonald's sets up and posts these are the positions for which you to apply. My understanding is that was not the practice. The practice is you have to seek advancement by making a verbal request. I would like to be promoted. This is my performance. Promote me. What about the suspension? It appeared to me that he had – is there anything in the record about whether he had ever been suspended in his previous employment? Never. And he was suspended, what, a few weeks after he filed a complaint? Three weeks afterwards. And that's on the particular retaliation claim. And we thought, and I think the authority is clear, that when you have the timing of the adverse employment action so close, and we're talking here in this case three weeks, and in other cases with some of the authorities you're talking six months or even eight months, that that would be sufficient. We were talking three weeks, that the jury should at least take a look at, well, how is that possible? Why did that happen? And then you also have to look at the circumstances around that suspension. The policies at McDonald's say if someone is being accused of a violation, you want to get the whole story. You want to investigate. You don't want to just impose discipline haphazardly. So are you saying that any time I make an EEOC complaint, I have a period, some period, who knows how long, three weeks, three months, six months, when if you dare to take any action against me of any kind, I've at least got a lawsuit and you're going to a jury with it. Is that what you're saying? No. I'm not saying that. No, I'm not saying that. Thank you, Your Honor. I think you have to look at this. Let's look at the underlying circumstances around that suspension. Okay. You have a complaint. I did not get promoted based on my race. You have an incident where you're accused. You're accused of violating labor laws, which was not substantial. He was accused of violating McDonald's policy. He had previously violated McDonald's policy. He had then been sent or went to a program at some time to make sure he understood McDonald's policy. And then he's accused of again violating the policy. And we've got a little thing here by him which says, I agree that I went and said you could do A and B and I shouldn't have done that. So there we go. Now, I don't see what difference it makes if it does violate the law or doesn't violate the law. If it violates the employer's policy, that would seem to be enough. And he knew that and he agreed that he was violating their policy. He had done it before. And so they suspend him for a week. What's wrong with that take on it? Okay. No, there is a dispute as to whether he had violated it before. And that is also in his declaration with regard to the Ms. Maciel incident. He had indicated that he wasn't even present at the store when the issue came up about her receiving the pay. The stuff they had before him suggested that he had, according to her anyway, he had violated it before. Whether he did or not, he had then gone to this program where they told him what the policy was. And he does agree that after the program, he still almost, let's say didn't, almost violated the policy again. Okay. No question about that, is there? I mean, he agreed to that. And then when he provided his explanation as to what he was thinking regarding why he did the procedure the way he did. Yes. I think that should have been accepted by, not necessarily accepted, but received by the companies to see what was his motivation, what was his intent regarding are you following these policies or not. He's got it. He did it. He admits he did this wrong thing and he's got a reason about his intent. And they say, okay, we're going to suspend you for one week. He fixed, but he fixed the situation before they wanted to bring allegations against him. He did fix it. I understand that perfectly. But my question to you is how does it show that he's been told what the policy is. He comes very close to violating it. The employee thought he was violating it. He says, no, I just came real close to violating it. I did do something wrong when I told the employee, but I fixed it before you guys found out about it. What is it that makes it discriminatory for them to say, well, fine, we're going to suspend you for one week. Because their guidelines say before we impose discipline, we're going to take statements, we're going to counsel, and we want to develop the entire record, which they did not do. And we contend that in light of this proactive approach that the company has with regard to managing managers so that they can be efficient administrators, when you don't do that, you have to wonder what is the intent for not doing that. Why wouldn't he be given that opportunity to give his side, to be counseled, to explain what's going on. Remember, we're talking an eight-year track record of no discipline at all. No discipline at all. And all of a sudden, within six months of the new supervisor. And again, when you want to go back to the previous incident, you say, well, he's done it before. So that's disputed, and that was all part of the frustration that he was getting from Ms. Azizi, that she was out to get him, that she was targeting him by having these things set up against him. So I think. Do you guys have some time for a photo? Yes, I will. Let me just. Is there any evidence in the record how other suspensions were handled, or were they just none on average? Yeah. I don't think. What the evidence shows is, according to the guidelines, before a suspension is imposed, you take statements from everybody. So you get a full, clear. Your reliance is on the guidelines for that. The guidelines, right. And so in the absence of having Mr. Price's version of the story, it seems to me that they really didn't care about trying to do discipline in the right way. They wanted to make sure they imposed discipline. From whom do you take statements? They got a statement from the person who said he was affected, and they got a statement from Price. From whom else are they supposed to take statements? They did not get a statement from Price until after they had issued the suspension. There's this. What's this printed out thing from him that's explaining it and has his name at the bottom? He didn't make that statement? You're talking about. That's the statement. I'm talking about that statement, yeah. That's the statement that was prepared by Tracy Vargas, and that was in relation to the Maciel incident, not the. No, no. No, no. I'm looking at one that's. What's that? Well, I've got a 54 on it. An excerpt of record 54. I think, Your Honor, what you're talking about, that was prepared after the suspension had already been imposed, and isn't it? That. What's the date? Excuse me. What's the date on that? Let's see. July 3rd, right? Yes. And this is talking about the class, about Dehaza. Marco Dehaza was going to attend the class in June. He submitted that statement after he had already received the note indicating he had been suspended. So the decision had already been made. That's his July 6th note. Dehaza says that on July 3rd, and he makes a statement on July 6th. Is that right? Correct. The statement had the decision to suspend him had already been made before that statement was submitted. He wanted to have a record in terms of what was going on. I will reserve two minutes for that. Thank you very much.  You may start by just confirming or commenting on the last sequence, the time sequence. The July 6th statement that he provided was provided at the meeting where he was informed of his suspension. It's not part of an investigation that led up to the suspension. I'm sorry? It's not part of an investigation that led up to the suspension. Well, it was part of the investigation in the sense that they had gathered all of the evidence, time sheets, statements from others and had concluded in view of the fact that he had gone to the seminar and had gone to and had been accused and there had been evidence of a prior problem in this area. They had made the decision to suspend him. However, when they presented that to him, they did get a statement from him wherein he admitted to the wrongful conduct. Had he come up with another explanation that said, no, this did not happen, then they certainly would have been free to not suspend him at that point. So it's not as if they had irrevocably decided to suspend him before they got a statement. And I would also add that the guidelines to which the appellant refers to do not specifically state that statements from whom they have to be taken. They simply are advice on how the statements are to be taken, but not from whom. But I really think that's not so much the point because with regard to the retaliation case, you have a situation where the misconduct which triggered the adverse action is undisputed. The appellant admitted it. And so there's really no way to show that the action was protectual. Kagan. The misconduct was essentially that he offered to do something and then realized it was the wrong thing to do and didn't do it. Well, the conduct was, yes, and it's a little bit more complicated than that. And the reason why it's a little bit more complicated than that is what happened is the context. The context of the retaliation case is at the end of May, the plaintiff makes an offer to Ms. Maciel about working overtime and working comp time instead of the overtime and not being paid the overtime premium. This is a huge issue for a company like McDonald's. In California, on a daily basis, there are wage and hour class actions filed. There are wage and hour claims filed. McDonald's has to take a very strong line against these types of situations. That complaint is made. They start the investigation five days later after they bring that to him. And they have a discussion about the Maciel incident with him. Five days later, he files an EEOC charge. That's on June 3rd. On or about June 13th, he and other managers are sent to a wage and hour seminar where he is specifically told, do not work your employees off the clock. Do not provide comp time. That's illegal. You have to pay people overtime. A week, 10 days later, he does the exact thing that he is told not to do. He knows it's wrong.  He says it's a mistake. I should have done that. And he retracts it. Well, that's not exactly what happened. What he said in his deposition is he says that he made the offer to Mr. Dehesa, you can go to this food safety class and you can work a day off and you'll get paid for it and you get the comp time but not the overtime. The time records are then done. Mr. Dehesa's time records do not reflect the overtime. Mr. Price then says in his deposition when he has this meeting with Mr. Dehesa after the time records have been inputted, and this is Mr. – and this is at supplemental excerpt of the record 240 lines 1 to 8. This is Mr. Price talking. Preston, did you pay me – and he's referring to what Mr. Dehesa told him. Preston, did you pay me my hours for the class? I said no. I forgot. He said make sure you pay me. I said okay. And in a laughing matter he said make sure it's overtime, okay. I said yeah, no problem. If Mr. Dehesa had not gone to Mr. Price and said make sure I get my overtime, boss, he wouldn't have gotten it. So – How do we know that? Because that's what Mr. Price's deposition says. He says that the time records had been punched in. Mr. Dehesa had – what actually happened was Mr. Dehesa went to the food safety class in the morning. He's working the night shift at his restaurant. He comes to the night shift, punches in when he gets there at about 4 o'clock or 6 o'clock, I guess. He's already worked eight hours at that food safety class. It's not on the time records because he couldn't punch in. It wasn't at the time records. It wasn't at the store. He then works a complete shift. Mr. Price, and it's in the record, Mr. Price has to review the time records on a daily basis to make sure people didn't forget to punch in, didn't forget to punch out. Mr. Dehesa had not punched out that night. And Mr. Price looked at the time record and put in a punch-out time at like 12 at night. And he could easily have simply forgotten that the guy had gone to a meeting earlier. Well, I suppose he could have forgotten, but you have to combine the – He was just doing a mechanical thing, going through and making sure that people filled in. Well, but that's a very important thing to do because he's the person on the ground who has to make sure the wage and hour laws are filled. Somebody had signed in and not signed out, so he signed them out. And that was just a – Right. And then – now, remember, though, he's made an offer to Mr. Dehesa. You can work without getting paid overtime, essentially. Mr. Dehesa then reviews the record and says, gee, I never got my overtime. And then he changes it. The ultimate question here is really whether any reasonable juror – I mean, you speak quite persuasively, and you could make this argument as a jury, and I'd say you have a 75 to 80 percent, maybe more than that chance of winning. But the question really is whether any reasonable juror could conclude otherwise on the record, given the very short time frame between the time of the EEOC complaint and the suspension, the fact that this person had been employed for eight years and never suspended, and the fact that this was a sort of an inchoate crime and the lack of investigation. Those would be the elements. And the issue is, is that enough to raise an inference that the explanation was pretextual such that we should not firm a summary judgment? Because that's our only question. It isn't whether you win or lose. I agree that that's the ultimate question, but I take issue with a couple of points in your question. First of all, there wasn't no investigation. There was an investigation in both instances, and that's in the record, that both when the Maciel incident at the end of May, there was an investigation. Then the EEOC claim is filed. He goes to a seminar. Then he engages in what is clearly violative of McDonald's policy number 73. There's no question about that. And the only question, then, is they do an investigation. They talk to Dehesa. They get a statement from him. They look at the time records, and they say, you know what, he did it again. This is exactly what we told him not to do at the seminar. And exactly the first set of time records. No, they looked at the time, the punch-out records for Mr. Dehesa, and they showed that there were alterations. They had already been corrected. Well, they had been hand-corrected and signed off by Mr. Price. And so they looked at it and said, look, if he had changed the punch-out time for Mr. Dehesa, you know, how could he have forgotten that Mr. Dehesa had gone to the food safety class when, in fact, we know. That's a classic thing to ask somebody. I mean, I think of everything I do every day. It would be pretty easy. But even if he had forgotten, he shouldn't have made the offer. Well, that's true. And that's what he. And there was a technical violation. But I would assume they would also think that one of the things they want to teach people is to self-correct, which is what happened here. Well, they also want to make sure people, managers do not ask subordinates to work off the clock. And McDonald's is extremely sensitive to that. And so what they did was they found out that he had made and there's no dispute that he made this offer. And that's undisputed. And it's really not for. Tell me again what the time record discrepancy is. He punches. The man comes to work at night, punches in at midnight or something like that. Well, he works all day at the food safety class. There's no. Then he comes in to work the second eight hours of his day at night at the restaurant. Punches in four o'clock. Right now. He's not he has not punched in for the food safety class. Right. OK. And then at night he punches out when he goes home at midnight. I thought the problem was he didn't punch in. Wasn't that the problem? Well, he worked at the food safety class and he had not punched in. So there's no record of those eight hours that had to be done by a manager because he couldn't punch in at the food safety class. Because he can only punch in at the restaurant. So he punches in at the restaurant. And then the manager's responsibility is to look at those time records and make sure they're accurate. Maybe I'm misunderstanding something. But I thought the problem was that when Mr. Price went over the records, there was a problem with the time records that had nothing to do with whether the guy was or wasn't at that class, which is I believe that he never punched out. That's correct. All right. So he was looking at the time records and he saw there was a problem with them because there was something missing. He hadn't punched out. So he corrected them to just on their face. That's correct. Right. And so there was no discrepancy on the time records as such. The problem was that it didn't reflect the time that he was at the class. And nobody ever said to Mr. Price before issuing the suspension, what about this? Well, they did it at the time they issued the suspension. And they did it at in the sense that they said this is you violated the policy. And I think that that is really the larger point here is that there's no dispute that he made the improper offer. And I don't think that it's the province of the jury to be the super personnel board to decide, well, that's no harm, no foul. It's a violation of McConnell's policy. That's not what they'd be deciding. They would be deciding, and the question is could they do that, that this all smells funny because he was an eight-year employee, because it was three weeks after he filed a Title VII charge, and because the actual violation never actually happened. So although it was technically a violation of the policy, it seems pretty peculiar without even asking him to what they did. This is how a juror might think. I'm not saying I think that way. And that they decided at that point to suspend him. Maybe they were trying to make some other point, somebody might say to themselves. Well, I think that the reach that has to be made if that is the way one wants to go is that you have to then say that a person who files an EEOC charge, as Judge Fernandez just indicated far more eloquently than I could, that you essentially get out of jail free card for a certain period of time, that no matter what you do, even if you violate policy, even if it's a technical violation. Well, I guess what he's saying is that, because there's not nothing more. If there were nothing more, that would be one thing. But you'd be saying that as the time shrinks between the event, the charge and the event, the prima facie case becomes stronger, so the additional material that has to be added becomes lesser. But this isn't to say that it can be zero in order to get by the pretext question. And that's all you're doing is you're just getting by the pretext question. Well, and I think that there has to be specific and substantial evidence of pretext. And all you have here essentially is timing and this notion that they didn't talk to him before they made the decision, although they did talk to him before they implemented the decision. As against, on the other side, the issue of there's no dispute that he violated the policy. And that he corrected the problem, which is sort of true. Well, but I think that from McDonald's standpoint, the violation of the policy is what is mandated in the business policies that it's a one-week suspension. And that's what happened. He wasn't fired. The policies say that if you violate the policy, it doesn't matter if you correct it later. If you violate the policy, you then get suspended. Do you want to discuss the rights discrimination issues at all? Just briefly. With regard to the promotion case, I think that the plaintiff can't make a prima facie case because he admitted that he was not he had to improve his job performance before he could be promoted. And we've now heard today that the plaintiff is not complaining that he was not promoted in December. That is a new admission today. And I think it's a wise one because there was no basis for it. But on December 1st, and I think it's important to understand the timetable here, on December 1st, or on or about December 1st, McDonald's promotes in the Los Angeles region, 11 managers to area supervisors. Of those 11 managers, two are African-American. Plaintiff is not one of them. In December and January, McDonald's promotes two other employees to area supervisors. One is African-American. One is Hispanic. The last one who is promoted is on February the 10th, 2002. From February the 10th until after Mr. Price resigned, no one is promoted. So we have an admission in this case at supplemental excerpts of the record 173, lines 22 to 24, question. So as of February 12th, there were areas where you needed to improve so you could be promoted. Answer. That's correct. So he's admitting as of February 12th, which is at the point where there are no nobody else is getting promoted after that point. He needs to improve his performance. So effectively, he's not qualified to be promoted. Now, moreover, in January and December, there is much evidence in the record showing his poor job performance. And on January 17th. You know, that would be more convincing if we knew what grades other franchises were getting. I mean, I look at those and I don't really know what to say about a B or an F or anything else unless I know whether that's an unusual grade or not. Well, I understand that. But first of all, the grades that were listed in the record refer to his job performance prior to December, which he's now admitted that he doesn't he didn't think he should have been promoted in December. Second of all, to answer your question. You just said that the EOC charge didn't cover it. Okay. Well, second of all, I think that it is certainly the plainest burden in this case to show discrimination. And as part of that burden, he would have to present comparable evidence that stores were equally bad and people got promoted from them. He didn't do that. There is evidence in the record from Mr. Cantor, the decision maker, that this was poor performance and didn't justify a promotion. And I would also add with regard to Mr. Cantor, he's the decision maker. He's the one who makes the decision whether he gets promoted, not Mrs. Easy. And Mr. Price admitted in his deposition. And this is at page 139 of the supplemental excerpts. Question. Do you think he, Mr. Cantor, has always treated you fairly in your employment at McDonald's? Answer. Do I think that Sam has always treated me fairly? Is that your question? Question. That's right. Answer. Yes. So he admits that the guy who supposedly discriminated against him or certainly would have made the decision to discriminate against him always treated him fairly. But isn't he making that decision with input from Mrs. Easy? Well, certainly not in December because Mrs. Easy was promoted in December. Now, with regard to the December-January promotion where there were two people promoted, one of whom was African-American, on January 17th, Mr. Cantor met with Mr. Price and they had a meeting with an HR person to talk about his poor job performance. This is the January 17th memo. And on January 17th, what happened was they talked about it and Mr. Price admitted in that document that he had a variety of performance problems with his store, labor violations, misplaced time runs, cash problems. Now, the appellant said in his reply brief, well, that's not right because you can't rely on that because it's in Ms. Vargas, the HR person's handwriting, even though he signed it. Well, but he did more than that in his deposition. He admitted everything in that document was accurate. And that's that supplemental. You're saying now that he also was explaining that the problem was certain people and that he – I don't know if the implication was that he wanted them transferred or something with them. Does that appear in the record? I'm sorry? The implication of the argument earlier today was that there was a problem with certain individuals and that he asked for help with them, which I don't know whether that means he asked them to be transferred or something to that effect. Well, there are two things in the record that refer to that. First of all, he admitted in his deposition, and this is at the record of the supplemental excerpts, 123 lines 6 to 9, that he was ultimately responsible for everything that happened in the store. He was. I'm asking the question. Okay. With regard to assistants, Mr. Kantor has testified in his declaration that he provided when Mr. Price asked him, gee, I need some other people, he provided two assistant managers who were the best in the area to assist him. That was in December. It sounds like something of a thankless task. So I think that when you sum it up, that this is a fact case, and the facts in the record really demonstrate that McDonald's did nothing wrong in this case. They certainly did not fail to promote Mr. Price because of his race, and they certainly did not retaliate against him because he filed an EEOC charge. We know that he admits that he wasn't, he needed to improve his performance. He admits also that Mr. Kantor, the one who supposedly retaliated against him, made the decision to suspend him, always treated him fairly. He can't have it both ways. And he also admitted that he engaged in the violation of Business Policy 73. The judge got it right, and we think that the decision to grant summary judgment in this case should be affirmed. Thank you very much. Thank you, Counsel. Thank you, Your Honors. In response to the earlier question about where Mr. Price had asked Mr. Kantor for assistance, that would be in tab 10 of the excerpt from the record, page 126. That is Mr. Price's declaration, paragraph 9, when I informed Mr. Kantor that Mr. Ramirez left me with substandard managers. He simply replaced them with other substandard managers. In response to the issue about the scores, the comparison, the evidence that we submitted is from Mr. Price himself, and that's also under tab 10 of the excerpt from the record, page 126, paragraph 8, where Mr. Price personally reviewed the quality and service and the QSE report for the South Proctor Center, and he compared his restaurant scores with the scores of other restaurants in the center, and he personally observed that his restaurant scored an average score for other restaurants in that area, and that there were several restaurants in the center with equal or lesser scores. And so, again, we're talking about the. That's not really the relevant comparison. The relevant comparison is who was promoted. Well, it's tied in, and then that goes to my last point before I run out. It's tied in to whether they legitimately evaluated him as a person who's working versus using certain scores to justify not promoting him. It comes from the person who was promoted from that store which he took over under. That's also in his declaration. Is that in the record, what the scores were before he came in? It was a poor store. It was already a poor store. Mr. Cannon indicated that it was a challenged store, and he wanted somebody to turn it around. The person who left that poor store was promoted. So if the issue is this store is not performing, therefore, we're not going to promote you. What was the race of that person? Hispanic. Hispanic. That was Lourdes Ramirez, and that's also under tab 10 in Mr. Price's declaration, paragraph 6. The ultimate question, again, we were talking about whether a jury could find that there's something going on. Why would McDonald's deviate from their practices? They have these policies. We're going to investigate. We're going to take a look, and we're going to see what's going on. Why would they deviate from it? And we're not going to take the statement of Mr. Price this time. We're just going to discipline him. If this is such a sensitive issue that we don't want employees working off the clock, why wouldn't the person who's making that decision take two minutes? Mr. Cannon, mind you, he's the one who made the decision to demote. He never spoke to Mr. Price at all prior to saying, I'm going to suspend you. So if it's so sensitive, why wouldn't he take him to the side? This is somebody who why wouldn't he take him to the side and say, Mr. Price, you have to understand. The suspension case here is we're talking about one week's suspension. Presumably in terms of damages or continuing on with the trial of this case, we're not talking about a lot. Is there any point to mediating this case further before we submit it? I don't know whether you've tried mediating it. If you want to answer the question, then I'll ask the same here, opposing counsel. I apologize, Your Honor. I'm trying to remember. Have we? Did we mediate? I believe we did mediate. We have court mediators. They're quite successful. They're usually useful. What we could do is not submit the case for a couple weeks and give you a chance to just consider whether to do that. Then we would submit it. We'd be amenable to that. Okay. Do you have one last question? No, that's it. Okay. Thank you very much. Thank you. Do you have a response to that? We have not gone through mediation. It has been discussed among the parties, and we did not believe that it was going to be fruitful because of the differences in ranges of expectations. Do you have any objection to trying this two-week delay to have one of our mediators get in touch with you and see if this goes anyplace? I'm not optimistic that it will resolve anything. I see. Okay. Thank you very much. Thank you. I wanted to thank both counsel for really a very good argument, a very fact-intensive case. It's unusual to have people who know the record as well as most of you do, and they're not really useful. Thank you.
judges: Canby, Fernandez, Berzon